CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
OCT 19, 2017
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BIANCA JOHNSON and DELMAR CANADA, | )<br>)<br>) |
| Plaintiffs, | ) Civil Action No. 3:16CV00016<br>) |
| v. | ) **MEMORANDUM OPINION**<br>) |
| ANDREW HOLMES, JOHN DOES 1-3, and ALBEMARLE COUNTY, | ) By: Hon. Glen E. Conrad<br>) United States District Judge<br>) |
| Defendants. | ) |

Bianca Johnson and Delmar Canada filed this civil rights action under 42 U.S.C. § 1983 against Andrew Holmes, a police officer employed by the Albemarle County Police Department ("ACPD"); three unknown police officers; and Albemarle County ("the County"). The action arises from Holmes' efforts to search the plaintiffs' residence following a traffic stop. The plaintiffs claim that Holmes engaged in racial profiling in violation of the Equal Protection Clause of the Fourteenth Amendment and that the County is subject to municipal liability for the alleged violation. Holmes and the County have moved for summary judgment. For the following reasons, the motion will be granted in part and denied in part.

## Background

The following facts are either undisputed or presented in the light most favorable to the plaintiffs. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013).

I. **The Traffic Stop and Subsequent Search of the Plaintiffs' Residence**

On the afternoon of April 26, 2014, Holmes, who is Caucasian, was on duty as a patrol officer for the ACPD. His "main goal" that day was to use "traffic enforcement . . . as a tool to do

criminal interdiction." Holmes Dep. 227, Docket No. 49-1; see also id. (explaining that "you utilize traffic laws, different infractions of the traffic laws to initiate stops on people and do criminal interdiction" for "the gamut of criminal elements," including "narcotics"). According to Holmes, such work is necessary because "[n]o one drives around with signs on the side of their car that say 'I'm carrying drugs.'" Id.

Holmes parked his patrol vehicle in the parking lot of a Super 8 motel on Greenbrier Drive in Charlottesville, Virginia, where the ACPD "tend[ed] to have incidents" involving "narcotics activities." Id. at 13. The motel is located across the street from a 7-Eleven convenience store. As part of his criminal interdiction efforts, Holmes ran the license plates (or "tags") of vehicles in the parking lots of both businesses through the Virginia Criminal Information Network ("VCIN") system.

At approximately 5:43 p.m., after running the tags on several other vehicles, Holmes ran the tag on a BMW 7-series sedan with the license plate number WZA5310. Holmes learned that the vehicle was registered to Bianca Johnson. Holmes remembered hearing about a previous call for service involving Johnson and her husband or boyfriend. At that time, Holmes searched another police database to check for individuals linked with Johnson. Holmes discovered that Delmar Canada was listed as an "associate" of Johnson. Holmes Decl. ¶ 6, Docket No. 46-2. Holmes remembered hearing Canada's name in relation to the previous call for service. He also recalled hearing that Canada's license was suspended. Holmes clicked on a hyperlink associated with Canada's name and was able to see a photograph of Canada. He learned that Canada's driver's license had been suspended for failing to pay child support.

At some point during that process, an African-American man exited the 7-Eleven and got in the driver's seat of the BMW sedan. Holmes matched the photograph from the police database

2

to the man who entered the vehicle and determined that Canada was the driver. Consequently, after Canada exited the 7-Eleven parking lot and turned on to Greenbrier Drive, Holmes initiated a traffic stop of the vehicle. Canada immediately pulled into the parking lot of a nearby business, where the stop was conducted.

The recording equipment in Holmes' patrol car captured the traffic stop on video.* After approaching the vehicle, Holmes asked Canada why he was out driving and informed him that his license was suspended. In response, Canada indicated that he was not aware that his license was suspended and that he had not received any paperwork advising him of the suspension. Canada advised Holmes that he had previously paid $1,500.00 to get his license back after failing to make child support payments. Holmes subsequently inquired as to whether Canada had the vehicle registration. He then commented on the large size of Canada's cell phone and peered into the window of the vehicle. Shortly thereafter, a dispatcher radioed Holmes and advised him that records indicated that Canada's license had been suspended on March 28, 2013, and that notice had been delivered via first class mail. In the meantime, Canada contacted Johnson and arranged for her to bring the vehicle registration to the scene of the traffic stop. While waiting for Johnson, Holmes returned to his patrol vehicle.

Several minutes later, just before Johnson arrived, Holmes returned to Canada's vehicle and inquired as to how much he still owed for child support. Holmes explained that Canada's license was still suspended due to failing to make child support payments. At that point, Johnson arrived at the scene of the traffic stop with the vehicle registration. Johnson, who is also African-American, was driving a BMW sport utility vehicle. Holmes advised them that Canada would not be allowed to drive the BMW sedan from the scene.

---

* The court has reviewed the video, which is designated as Defendants' Exhibit 4, Docket No. 46-4.

3

While Holmes was talking to Canada and Johnson, a female officer approached Johnson's vehicle. After Holmes answered questions from Johnson regarding the basis for the stop and the manner in which Holmes had determined that Canada's license was suspended, Holmes and the female officer returned to the patrol vehicle. While there, the female officer observed that Canada was driving a "nice car." See Video of Traffic Stop 13:16. In response, Holmes noted that it was an "expensive car." Id. at 13:20.

Johnson subsequently approached Holmes' patrol vehicle and requested Holmes' badge number and a business card, which he gave her. After she walked away from the vehicle, Holmes commented to the female officer that Johnson was probably upset because he had run the tags on the vehicle Canada was driving. Holmes noted that he did not care if Johnson was upset.

At the conclusion of the traffic stop, Holmes issued Canada a summons for driving on a suspended license. After going over the summons with him, Holmes explained that if Canada took care of the child support payments and got his license back from the Department of Motor Vehicles ("DMV"), the state court might reduce the charge to driving without a license. Following the traffic stop, Holmes ran additional license plates through the VCIN system.

At some point thereafter, Holmes contacted a supervisor with the Jefferson Area Drug Enforcement ("JADE") task force and inquired as to whether there were any active drug investigations involving Canada. The supervisor advised Holmes that Canada's name was familiar but that he was not involved in any open investigations by the task force.

On April 27, 2014, Holmes applied for a warrant to search the plaintiffs' residence for the suspension notification paperwork that purportedly had been mailed to Canada. In the affidavit submitted in support of the search warrant, Holmes stated that the search was requested in relation

to the offense of "[o]perating a motor vehicle on the public roadways of the Commonwealth while license or privilege to drive has been suspended in violation of Virginia [C]ode 46.2-301." Aff. for Search Warrant, Docket No. 46-5. The search warrant was issued by a magistrate that same day. The warrant directed officers to "forthwith search" the plaintiffs' residence, "either in day or night," for the "Department of Motor Vehicles suspension notification form for Delmar Gene Canada." Search Warrant, Docket No. 46-5.

Although Holmes had previously issued citations to over 50 people for driving on a suspended license, he had never applied for, or executed, a warrant to search for a suspension notice from the DMV. Likewise, there is no evidence that anyone else in the ACPD had taken such action. See Rule 30(b)(6) Dep. of Lieutenant Darrell Byers 78, Docket No. 49-7 (acknowledging that the deponent had never obtained a warrant to search for a DMV notification form in his 18 years as a police officer, and that he did not know of any other officer who had done so). Holmes claims that he had learned from another officer who had attended "some sort of gang training" that "obtain[ing] search warrants [in] reference to driving suspended notifications" could be used "as part of an investigative tool." Holmes Dep. 51. In this particular case, Holmes believed "that there was a possibility that [he] would find some narcotics inside [the plaintiffs'] residence." Holmes Dep. 67; see also id. at 68 ("The warrant was obtained as part of an investigation in reference to the driving suspended notification. Was there a possibility that I was going to find narcotics inside that residence? Yes, sir.").

Holmes and two other officers executed the search warrant five days later, after 11:00 p.m. on a Friday night. During the search, Holmes made comments about the money that he located in the residence. Ultimately, he and the other officers did not find the DMV notice or any narcotics. Prior to leaving the plaintiffs' residence, Holmes returned Canada's driver's license to him.

5

## II. Statistical Evidence

Holmes was ordinarily assigned to sectors 1 and 2 of the ACPD territory. The traffic stop and subsequent search occurred within those sectors. According to statistical data generated by the ACPD, the population of sectors 1 and 2 is 68.04% white and 18.21% black. The population of the entire county is 80.56% white and 9.69% black.

The record includes a racial breakdown of the summonses/citations issued by Holmes in years 2009 through 2016, and a racial breakdown of the arrests made by Holmes during those same years. For all of the other officers assigned to sectors 1 and 2, the record includes a racial breakdown of their citations and arrests in 2015.

From 2009 through 2016, Holmes issued 655 summonses. Of those, 46.56% were issued to black individuals and 53.13% were issued to white individuals. During the same time period, Holmes made 330 arrests. Of the individuals arrested, 60.30% were black, and 39.70% were white.

In 2015, the only year that data was provided for all officers assigned to sectors 1 and 2, Holmes issued summonses to 92 individuals. Of those, 51.09% were black and 47.83% were white. That same year, Holmes made 67 arrests. Of the individuals arrested, 59.70% were black and 40.30% were white.

All of the other ACPD officers assigned to sectors 1 and 2 issued a total of 285 summonses in 2015. Of those, 21.75% were issued to black individuals and 73.68% were issued to white individuals. That same year, all of the other officers assigned to sectors 1 and 2 made a total of 207 arrests. Of the individuals arrested, 38.16% were black and 60.87% were white.

### III. The ACPD's Polices and Responses to Complaints

In 2002, the ACPD adopted a policy on "bias-based policing." See ACPD Rule 1-05 at 1, Docket No. 46-11. The purpose of the policy was to make clear that such policing, defined as "[t]he detention, interdiction or other disparate treatment of any person on the sole basis of their racial or ethnic status or characteristics," is "unacceptable." Id. The policy emphasizes that all citizens have "the right to equal protection under the law" and "the fundamental right to be free from unreasonable searches and seizures by government agents," and that the ACPD "is charged with protecting these rights, for all, regardless of race . . . ." Id. at 2.

Between 2011 and April 26, 2014, the ACPD received five complaints from African-American citizens alleging that Holmes had engaged in racially-biased policing. According to the defendants, all of the complaints were determined to be "unfounded or Holmes was exonerated." Byers Decl. ¶ 6, Docket No. 46-10.

After the subject stop and search, the ACPD received a complaint from the plaintiffs alleging that Holmes had engaged in racial profiling. Sergeant Greg Davis was appointed as the investigating officer. Davis interviewed several individuals, including the plaintiffs, Holmes, and the other two officers who assisted Holmes in executing the search warrant. Davis found that Holmes had acted improperly in returning Canada's driver's license rather than submitting it to the DMV, and by failing to complete an incident report as required in all cases involving a search warrant. In his investigation report, Davis also noted that the timing of the execution of the search warrant "could be scrutinized to be more considerate while serving low risk search warrants for personal papers." Internal Investigation Report at 8, Docket No. 46-1. Davis ultimately determined, however, that Holmes had not engaged in bias-based policing.

Additional civilian complaints were lodged against Holmes after the subject incident. See Davis Dep. 54-55, Docket No. 49-14 (acknowledging that the department received a total of eleven complaints in 2014 and a total of seven in 2015). However, the record is devoid of any details concerning the subsequent complaints. According to the defendants, none of them were sustained.

### IV. Testimony from Other Individuals

The plaintiffs have offered declarations or deposition testimony from other African-American individuals who were stopped by Holmes while driving expensive-looking vehicles. The individuals maintain that they were stopped for no valid reason and that Holmes endeavored to search their vehicles without probable cause.

Additionally, both sides have provided excerpts from Pamela Greenwood's deposition. Greenwood worked as a police officer for the ACPD from 1997 until 2012. At some point during her tenure, Greenwood heard officers use racial slurs and witnessed officers stop vehicles after commenting on the race of the driver. However, Greenwood could not recall the specific period of time in which such incidents occurred. See Greenwood Dep. 14, Docket No. 49-15 ("I stopped exposing myself to certain people there, so it could have gone on up until I left, but I couldn't tell you."). Greenwood testified that she did not report the incidents to higher-ranking officers because she did not want to deal with any "negative consequences." Id. at 16. Greenwood also testified that she never witnessed Holmes speak negatively of another race.

### Procedural History

In February of 2016, Johnson and Canada filed suit against Holmes in the Circuit Court of Albemarle County. Holmes removed the case to this court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

On April 8, 2016, the plaintiffs filed an amended complaint against Holmes, three unknown police officers, and Albemarle County, asserting claims under 42 U.S.C. § 1983. In Count I, the plaintiffs alleged that Holmes "violated [their] rights protected by the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches." Am. Compl. ¶ 22, Docket No. 20. In Count II, the plaintiffs alleged that Holmes "violated [their] rights protected by the Fourth and Fourteenth Amendments . . . to be free from unreasonable seizures" by "seizing the plaintiffs in order to conduct an unreasonable search." Id. ¶ 26. In Count III, the plaintiffs asserted that the conduct described in the complaint "violated [their] right to equal protection of the law as guaranteed by the Fourteenth Amendment." Id. ¶ 28. Specifically, the plaintiffs alleged that "[t]he application for a search warrant in this case and the search itself were motivated, in significant part, by [their] race." Id. ¶ 19.

Holmes and the County moved to dismiss the amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On September 6, 2016, the motion was granted in part and denied in part. The court concluded that Holmes was entitled to qualified immunity on the Fourth Amendment claims arising from the issuance and execution of the search warrant, since it could not be said that Holmes violated the plaintiffs' clearly established rights under the Fourth Amendment. However, to the extent the plaintiffs alleged that the search of their residence was racially motivated, the court held that the plaintiffs stated a plausible equal protection claim against Holmes. Likewise, the court held that the amended complaint set forth sufficient facts to state a claim for municipal liability against the County.

Following the completion of discovery, Holmes and the County moved for summary judgment on the remaining claims. The court held a hearing on the motion on September 21, 2017. The motion has been fully briefed and is ripe for review.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the nonmoving parties, and draw all reasonable inferences in their favor. Anderson, 477 U.S. at 255; Libertarian Party of Va., 718 F.3d at 312. The court "cannot weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015).

## Discussion

Section 1983 imposes civil liability on any person acting under color of state law to deprive another person of the rights and privileges secured by the Constitution and the laws of the United States. 42 U.S.C. § 1983. The plaintiffs claim that Holmes' actions in securing and executing a warrant to search their residence resulted from racial profiling in violation of the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs seek to hold Holmes and the County liable for the alleged violation.

### I. Equal Protection Claim Against Holmes

It is well established that the Equal Protection Clause prohibits officers from selectively enforcing laws based on race. Whren v. United States, 517 U.S. 806, 813 (1996); see also Sow v. Fortville Police Dep't, 636 F.3d 293, 303 (7th Cir. 2011) ("Racial profiling, or selective enforcement of the law, is a violation of the Equal Protection Clause."). It is also well settled that "the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir.

2003); see also United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997) ("The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.").

"The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called 'ordinary equal protection standards.'" Marshall, 345 F.3d at 1168 (quoting United States v. Armstrong, 517 U.S. 456, 465 (1996)). To prevail on such claim, the plaintiffs must prove "that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose." Id. Plaintiffs "can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which 'addresses the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 534 (6th Cir. 2002) (quoting Chavez v. Ill. State Police, 251 F.3d 612, 638 (7th Cir. 2001)); see also United States v. Alabi, 597 F. App'x 991, 996 (10th Cir. 2015) (identifying "three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of a similarly situated individual who could have been, but was not stopped and arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior"). To satisfy the discriminatory purpose prong, the plaintiffs must prove that the actions taken against them were motivated, at least in part, by racial animus. See Marshall, 345 F.3d at 1168. A discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that [a practice] bears more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242 (1976). "Similarly, a police officer's pattern of traffic stops and arrests, his questions and statements to the

persons involved, and other relevant circumstances may support an inference of discriminatory purpose in this context." Marshall, 345 F.3d at 1168.

To withstand summary judgment, the plaintiffs are not required to conclusively prove the essential elements of their equal protection claim. Instead, they "must present evidence from which a jury could reasonably infer that [the defendant was] motivated by a discriminatory purpose and [that his] actions had a discriminatory effect." Id.; see also Bingham v. City of Manhattan Beach, 341 F.3d 939, 949 (9th Cir. 2002) ("To avoid summary judgment, Bingham must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated.") (citation and internal quotation marks omitted); Martin v. Conner, 882 F. Supp. 2d 820, 841 (D. Md. 2012) ("Martin need not provide overwhelming evidence—he must only show that a reasonable jury could conclude that a violation occurred.").

Applying these principles, the court concludes that the plaintiffs have adduced sufficient evidence to withstand summary judgment on the equal protection claim against Holmes. Viewing the evidence in the light most favorable to the plaintiffs, a jury could reasonably infer that Holmes' actions had a discriminatory effect and were motivated by a discriminatory purpose.

First, the record indicates that Holmes' decision to obtain a warrant to search the plaintiffs' residence for a DMV notice was unprecedented. Although Holmes had previously issued citations to over 50 people for driving on a suspended license, he had never applied for, or executed, a warrant to search an individual's residence for a suspension notice. Likewise, it appears that no other officer in the ACPD had engaged in such conduct. Lieutenant Byers testified during his Rule 30(b)(6) deposition that he had never obtained a warrant to search for a DMV notification form in his 18 years as a police officer, and that he did not know of any other

officer who had taken such action. As the United States Court of Appeals for the Fourth Circuit has previously noted, "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures," can be probative of whether a defendant was motivated by a discriminatory intent. Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 819 (4th Cir. 1995).

Second, a reasonable jury could find that the search warrant was obtained as a pretext to search for something other than the paperwork described in the warrant affidavit, namely evidence of illegal drug activity. At the time of the traffic stop, Holmes was engaged in criminal interdiction efforts in an area known for narcotics activity. During his deposition, Holmes testified that he had learned from another officer that obtaining a warrant to search for a suspension notice could be used as an "investigative tool." Holmes Dep. 51. Holmes also testified on more than one occasion that he thought he might find narcotics inside the plaintiffs' residence. See id. at 67-68. Additionally, Holmes did not immediately execute the search warrant after it was issued. Instead, the warrant was executed five days later, after 11:00 p.m. on a Friday night. While executing the search warrant, Holmes commented on the money that he found in the residence. In light of this evidence, and in the absence of any indication that he or any other ACPD officer had previously found it necessary to search for a DMV suspension notice, a reasonable jury could find that the real reason for obtaining the warrant was to search for narcotics.

Third, a reasonable jury could find that Holmes' belief that he would find narcotics in the plaintiffs' residence was grounded in the unwarranted and race-based assumption that African-Americans driving expensive cars are likely to be involved in drug trafficking. During the traffic stop, Holmes commented to another officer that the BMW sedan that Canada was driving was an expensive vehicle. After issuing Canada a summons for driving on a suspended

13

license, Holmes contacted a supervisor with the local drug task force and inquired as to whether there were any active drug investigations involving Canada. Even though Holmes was advised that Canada was not involved in any investigations, Holmes nonetheless believed that he would possibly find narcotics in the plaintiffs' residence. Viewing the record in the light most favorable to the plaintiffs, the court concludes that this evidence, when considered in conjunction with the anecdotal evidence of other African-American individuals who were stopped and searched by Holmes, creates a genuine issue of material fact as to whether his actions in the instant case were motivated, at least in part, by intentional race discrimination.

Finally, the plaintiffs' equal protection claim is bolstered by the statistical evidence in the record. The statistics indicate that in the year following the search of the plaintiffs' residence, Holmes cited and arrested African-American individuals at a significantly higher rate than other officers in his department. The statistics also reveal a striking disparity between the percentage of African-Americans in the relevant population of Albemarle County as compared to the percentage of African-Americans cited and arrested by Holmes. The court recognizes that "statistics are not irrefutable" and, "like any other kind of evidence, they may be rebutted." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339-340 (1977). Nonetheless, at this stage of the proceedings, the record must be viewed in the light most favorable to the plaintiffs. When considered in that manner, the statistics provide further support for a finding of discriminatory intent and effect.

For all of these reasons, the court concludes that a jury could reasonably infer that Holmes' efforts to search the plaintiffs' residence were motivated by a discriminatory purpose and had a discriminatory effect. Accordingly, Holmes is not entitled to summary judgment on the plaintiffs' equal protection claim.

## II. Municipal Liability Claim Against the County

The plaintiffs also filed suit under § 1983 against the County. While a municipality is subject to suit under § 1983, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978), liability attaches "only where the municipality itself causes the constitutional violation at issue," City of Canton v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691 (emphasis in original). Instead, a municipality is only liable if it causes the deprivation of a plaintiff's constitutional rights through an official custom, policy, or practice. Owens v. Balt. City State's Attys. Office, 767 F.3d 379, 402 (4th Cir. 2014); see also Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).

In their amended complaint, the plaintiffs alleged that Holmes had a history and practice of targeting African-Americans for "intrusive searches," and that "[n]umerous complaints by African-Americans [had] been lodged by citizens with the County of Albemarle through its police department, prior to the incident herein, against Defendant Holmes, complaining about his conduct in improperly stopping cars and unlawfully searching people and places." Am. Compl. ¶¶ 19-20. The plaintiffs further alleged that "no disciplinary or other corrective action was taken as a result of any of those complaints," and that the County "thereby acquiesc[ed] to Defendant Holmes' illegal behavior and implicitly encourag[ed] his practice of targeting African-Americans." Id. at ¶ 20. Thus, the plaintiffs' complaint asserted a theory of custom "by condonation." Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987).

Under the condonation theory of liability, a municipality violates § 1983 "if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'"

15

Owens, 767 F.3d at 402 (quoting Spell, 824 F.2d at 1389). "Prevailing under such a theory is no easy task." Id. As the Fourth Circuit explained in Owens, the plaintiffs "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" Id. at 402-03 (quoting Spell, 824 F.2d at 1386-91) (alteration in Owens). Although knowledge and indifference can be inferred from the extent of employees' misconduct, "[s]poradic or isolated violations of constitutional rights will not give rise to Monell liability; only widespread or flagrant violations will." Id. (internal citations and quotation marks omitted); see also Smith v. Ray, 409 F. App'x 641, 650 (4th Cir. 2011) (emphasizing that "'there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice,'" since "[a] municipality is not liable for mere 'isolated incidents of unconstitutional conduct by subordinate employees'") (quoting Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003)).

In addition to proving that an unlawful custom or policy existed, the plaintiffs must establish the existence of a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, 489 U.S. at 384. Stated differently, the plaintiffs must prove that the custom or policy was "the moving force of the constitutional violation specifically charged." Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984) (internal citation and quotation marks omitted). "Thus, municipal liability will attach only for those policies or customs having a 'specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" Carter, 164 F.3d at 218 (quoting Spell, 824 F.2d at 1390) (emphasis omitted).

In support of their Monell claim, the plaintiffs primarily rely on three pieces of evidence. First, the plaintiffs cite to Pamela Greenwood's deposition testimony to support the notion that a "culture of racism" existed within the ACPD. However, Greenwood stopped working for the police department in 2012 and could not recall when she heard other officers use racial slurs or target African-American drivers. Moreover, Greenwood acknowledged that she did not report the officers' behavior to her supervisors, and that she never witnessed Holmes engage in such conduct. The court agrees with the County that Greenwood's testimony, even when viewed in the light most favorable to the plaintiffs, does not support a reasonable inference that the County acted with deliberate indifference to a widespread practice of unconstitutional conduct, or that such practice was the moving force behind the equal protection violation alleged in this case. See, e.g., Watson v. Abington Twp., 478 F.3d 144, 157 (3d Cir. 2007) (holding that evidence outside the relevant timeframe that at some point officers engaged in racial profiling and used racial slurs was insufficient to sustain a claim under Monell).

Second, the plaintiffs take issue with the wording of the County's policy on racially-biased policing. The plaintiffs argue that it misstates applicable law by defining "biased-based policing" as the disparate treatment of any person on the "sole basis" of the person's racial or ethnical status. ACPD Rule 1-05 at 1; see also Pl.'s Br. in Opp'n 17, Docket No. 49 (emphasizing that the law "only requires that the conduct of the officer was motivated 'at least in part' by considerations of race") (citation omitted). While the plaintiffs are correct that the policy uses the term "sole basis" in its definition of biased-based policing, the policy goes on to make clear that all citizens have the right to equal protection under the law and the right to be free from unreasonable searches and seizures, and that the ACPD is charged with protecting these rights "for all, regardless of race." ACPD Rule 1-05 at 1-2. Considered in its entirety, the court is convinced that the policy clearly

17

admonishes against selective enforcement of the law and does not support a finding of liability under Monell.

Finally, the plaintiffs emphasize that the ACPD received a total of 18 civilian complaints against Holmes in 2014 and 2015, and that there is no evidence that Holmes was admonished for the number of complaints. This argument also misses the mark. In evaluating claims under Monell, courts have made clear that "mere recitation of the number of complaints filed [does not] suffice to prove a policy or custom. A plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." Mariani v. City of Pittsburgh, 624 F. Supp. 506, 511 (W.D. Pa. 1986); see also Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) (observing that "the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force"); Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987) (emphasizing that the plaintiff "never demonstrated that past complaints of police misconduct had any merit" and that "the number of complaints bears no relation to their validity"); Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985) (noting that "the number of complaints filed, without more, indicates nothing").

In this case, the majority of the civilian complaints were received after the subject incident, and the record is devoid of any details regarding the factual background of those complaints. Moreover, the plaintiffs have not offered any evidence from which a reasonable jury could find that the complaints had merit and were based on similar facts. See Sparrow v. City of Annapolis, No. WMN-16-1394, 2017 U.S. Dist. LEXIS 125796, at *38 (D. Md. Aug. 9, 2017) (observing that "complaints must be shown both to have merit and to be based on similar facts" in order "to give notice to a municipality of the need to train or supervise in a particular area"). To the contrary, the

plaintiffs themselves emphasize that Holmes' efforts to obtain a warrant to search their residence for a DMV notice were "highly unusual" and represented a "significant departure[] from normal procedures." Pl.'s Br. in Opp'n at 15-16. As such, the specific conduct at issue is the antithesis of conduct for which a municipality may be held liable under Monell. See Adams v. Orange County, No. 13 CV 8549, 2014 U.S. Dist. LEXIS 165620, at *11 (S.D.N.Y. Nov. 13, 2014) ("Rather than allege a policy or custom, plaintiff claims the police officers conducting the search of his residence 'went beyond a normal pattern of search and [seizure] regulations.' This is the antithesis of a Monell claim.") (citation omitted).

For all of these reasons, the court concludes that the plaintiffs have failed to adduce sufficient evidence from which a reasonable jury could find the County liable under § 1983. Accordingly, the County is entitled to summary judgment.

## Conclusion

For the reasons stated, the defendants' motion for summary judgment will be granted in part and denied in part. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 19th day of October, 2017.

_____
United States District Judge