CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
03/19/2018
JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BIANCA JOHNSON AND DELMAR CANADA,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANDREW HOLMES, *ET AL.*,<br><br>*Defendants*. | CASE NO. 3:16-cv-00016<br><br>MEMORANDUM OPINION AND ORDER<br><br>JUDGE NORMAN K. MOON |

  This selective law enforcement case is set for trial on March 20–21, 2018. The Court has heard argument on the parties' cross-motions *in limine*. The general overview of this case is as follows. In 2014, defendant police officer Andrew Holmes pulled over Plaintiff Delmar Canada, who is black and was driving a BMW, and cited him for driving on a suspended license. Canada denied knowledge that his license was suspended. Co-plaintiff Bianca Johnson later arrived on the scene, and Officer Holmes remarked she was driving a "nice" car.

  After the incident, Holmes obtained a search warrant for Plaintiffs' residence ostensibly to search for the notice of suspension that Canada denied receiving. (Prior to this, Holmes had inquired with the local drug task force about Canada and was told that, although his name was familiar, there were no drug investigations open against him.) Holmes then executed the search warrant on the house late at night, finding neither the suspension notice nor any drugs. The Plaintiffs' Fourth Amendment claim was previously dismissed by Judge Conrad, and trial is scheduled only for the Equal Protection claim. Generally, that claim is premised on the contention that Holmes was selectively using law enforcement mechanisms because Plaintiffs are black and based on Holmes' assumption that they were likely to be engaged in criminal drug activity because they were black citizens driving "nice" cars.

## I. Plaintiffs' *Daubert* Motion

Officer Holmes has identified Richard Morrison as an expert witness, and Plaintiffs move to exclude him an unqualified. Morrison is a police officer, and Plaintiffs assert that his expertise is unclear except "other than the most general [expertise] regarding police practices." (Dkt. 69 at 1). Most relevantly, Morrison intends to opine on the meaning of statistics Plaintiffs hope to offer to show Holmes engaged in racially disparate citations and arrest of blacks, and on Holmes' racial motivation for his actions.

Plaintiffs are critical of Morrison's hypothesizing about other factors that *could* have resulted in arrest disparities attributed to Officer Holmes. They also challenge Morrison's competency to opine about Officer Holmes' (supposed lack of) racial animus, which Morrison based on his review of Holmes' evaluations, training record, and promotion history. In sum, Plaintiffs contend that nothing in Morrison's report "is beyond the pale of ordinary jurors." (Dkt. 69 at 4). "Jurors can look at statistics just as well as" Morrison, who lacks statistical expertise, to assess a discriminatory effect, and they can just as well discern Officer Holmes' mental state. The Court largely agrees with Plaintiffs.

### A. Standard

An expert qualified "by knowledge, skill, experience, training, or education, may testify" as to scientific, technical, or other specialized knowledge *if* it will assist the trier of fact. Fed. R. Evid. 702. Such testimony is only admissible if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* "[A] court may consider whether the expert witness theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error;

and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation and internal quotation marks omitted); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993). This list of factors is not exhaustive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court's consideration of these factors is "to 'ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). If the expert meets this threshold, criticisms of his testimony will go to its weight, not its admissibility. *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017). A court must not evaluate the expert's conclusion itself, but only the opinion's underlying methodology. *Bresler*, 855 F.3d at 195.

"The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *Nease*, 848 F.3d at 231. "A reliable expert opinion must not be based on belief or speculation." *Id.* at 231. An expert must present "more than a hypothesis." *Id.* at 232.

**B.      Analysis**

Morrison spent 28 years in law enforcement and completed police academies for three different agencies. (Dep. at 6). He worked for the Roanoke Police Department for 21 years, retiring as a captain in 2017. (*Id.*). He was mainly focused on "using crime data to better use police resources to solve crimes" during his 9 years as a line officer. When promoted to sergeant, his duties became more managerial—*e.g.*, ensuring sufficient training, regulation compliance, etc. (*Id.* at 8). In 2000, he became certified as an instructor by the Department of Criminal Justice Standard Services (CJSS), a requirement to instruct other officers in Virginia.

Morrison trained officers on the application and execution of search warrants, with a focus on "bias-based policing" and community policing. (*Id*. at 10). He also was trained in and taught "tactical analysis," which he described as "using data beyond numbers" and "putting the why behind the numbers." Morrison admitted, though, that he was "not the data cruncher" and "not the person who develops the algorithms and does all the research." (Dep. at 22). Instead, he was "the guy at the end of the day when all that is done" who helps with "when the information is presented in a way that the end user, which is the officer, can use that to dictate how he or she is going to patrol certain areas based on the crime." (Dep. at 22). He testified that when the data reveal a higher rate of interdictions against one race, "you can't glean from that alone about bias" because there are "too many variables," such as an officer's work zone and types of crimes he might be assigned to investigate. Morrison further stated that using general census population data is unhelpful because it "doesn't represent" the actual driving population in an area.

Morrison reviewed the depositions, Holmes' car camera video, Holmes' disciplinary record, his employee evaluations, and Albemarle County's policing policies. He opined in both his deposition and his report that bias had nothing to do with the search for the home, finding that Holmes acted "professionally" and stating that there was probable cause for the warrant based on Canada's denial that he received notice of his license suspension.

Morrison found nothing improper about the time the warrant was executed, stating that most warrants are executed in the evening or night. It is often preferable to execute a warrant at that time because normally fewer people are out during that time, lessening the spectacle and the possibilities of interlopers. He also vouched for the propriety of keeping Plaintiffs seated and restricted from moving about during the search, as this again concerned both officer and citizen

safety. Morrison concluded based on his review of the documents and depositions that Holmes conducted himself professionally during the search. (Dep. at 19–20). Morrison testified that there was nothing about the execution of the search warrant that made him think that Officer Holmes was acting on the basis of racial bias. (*Id*. at 20).

All told, Morrison appears to be qualified as an expert based on his training and experience in general police practices and could competently (and helpfully) testify as to whether actions by Officer Holmes complied with those practices. His opinions regarding the interpretation of the statistical data and of Holmes' intent, however, are neither within his realm of expertise nor helpful to the jury.

Although Morrison had some engagement with policing statistics in his career, he admitted that it was on the output end of the equation—effectively, helping officers glean from the statistics how to improve their policework. He has no experience with the collection, calculation, input, or generation of data. Additionally, while Morrison opines on what the data in this case means, neither his report nor his deposition details any "principles and methods" he used, how he applied them to the data, or whether any methods he might have used have been tested. Fed. R. Evid. 702; *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). Put simply, he has a bald opinion based on (rather common-sense) intuitions about the statistics. (Dkt. 69-1 at ECF 3–4). He is not a statistician, criminologist, demographer, or, in the case of his opinion about Holmes' intent, a psychologist. The Court will therefore not permit him to testify about whether statistics sought to be introduced by Plaintiffs illustrate a racially discriminatory intent or show the creation of a racially discriminatory effect, which are the elements of Plaintiffs' selective enforcement claim.[1]

---

[1] *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 634–35 (4th Cir. 2016) (civil

Morrison is competent to testify about whether Holmes' actions in obtaining and executing the warrant followed proper protocol (which could be relevant in showing a lack of bad intent), but he has no basis to testify directly about Officer Holmes' state of mind. The testimony is not permissible as lay opinion under Fed. R. Evid. 701, because such testimony "must be based on personal knowledge," which he obviously does not have. *United States v. Johnson*, 617 F.3d 286, 292–93 (4th Cir. 2010) (reversing admission of officer's testimony interpreting meaning of wiretapped phone calls when officer "did not participate in the surveillance during the investigation, but rather gleaned information from interviews" after listening to the calls). As for the Rule 702 side of the equation, Holmes has not offered any explanation for why the issue of his intent on the day in question is one of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). That is a question well within the comprehension of the ordinary juror. "The touchstone of admissibility of testimony that goes to the ultimate issue . . . is helpfulness to the jury." *United States v. Perkins*, 470 F.3d 150, 157 (4th Cir. 2006).

Accordingly, Plaintiffs' motion *is limine* is **GRANTED in part** and **DENIED in part**. Morrison may testify as to generally accepted police procedures standards, and whether Holmes' actions in this case complied with them. But he may not testify about the statistics or about Holmes' intent.

---

selective prosecution claim); *Martin v. Stewart*, 499 F.3d 360, 366 (4th Cir. 2007) (same); *see United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (importing selective prosecution standard into selective enforcement context); *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (same). The Court notes that as a historical matter the discriminatory intent/discriminatory effect elements trace back to the Supreme Court's decision in a criminal selective prosecution case. *United States v. Armstrong*, 517 U.S. 456 (1996). The Fourth Circuit has adopted those elements for criminal and civil selective enforcement claims, so the Court cites those cases interchangeably.

### III. Officer Holmes' Motion *in Limine*

Holmes challenges three categories of Plaintiffs' evidence.

#### A. Statistical evidence

Officer Holmes contests the admissibility of statistical evidence of his (and other officers') citation and arrest records broken down by race. This evidence, apparently obtained from Albemarle County's internal database, generally supports two propositions.

First, from 2009 to 2016, Holmes cited and arrested a greater percentage of black citizens than lived, per capita, within his designated geographic area and within Albemarle County generally.

Second, for 2015 (the year after the incident in question), Holmes cited and arrested black citizens at a higher rate than his fellow officers assigned to the same geographic area.

Holmes contests the admissibility of this evidence as irrelevant and lacking meaningful assistance to the jury, especially in the absence of expert testimony (which Plaintiffs have not proffered) to explain the data.

To evaluate this motion, the Court first looks to the elements of Plaintiffs' Equal Protection claim: racially discriminatory intent by Holmes and racially discriminatory effect of his actions. *See supra* footnote 1 (compiling cases).

##### i. Discriminatory intent

To prove the first element—racially discriminatory intent—Plaintiffs' need only prove that racial animus was but one of the reasons Holmes undertook the course of action he did against them. *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (stating plaintiffs "must show" action was undertaken in part for adverse racial effect in order to prove discriminatory intent); *United States v. Hare*, 820 F.3d 93, 100 n. (4th Cir. 2016) (stating

discriminatory intent "implies" action undertake for its adverse effect); *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (same); *Orgain v. City of Salisbury, Md.*, 305 F. App'x 90, 98 (4th Cir. 2008); *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (King, J., dissenting). In answering that question, the jury can take many factors into consideration, including any pattern of racially motivated actions by Holmes or any "historical background" of his actions that might reveal racial discrimination.[2] In light of these jury considerations, the data showing Holmes' comparably high arrest and citation rates of blacks is somewhat probative of his intent—at least when combined with other evidence Plaintiffs may adduce at trial. *See United States v. Venable*, 666 F.3d 893, 903–04 (4th Cir. 2012) (finding particular statistics insufficient and reiterating rule that statistical evidence alone cannot show discriminatory intent).

  ii.  **Discriminatory effect**

The statistics as a method of proving discriminatory effect, however, is another matter. To show such an effect, the Fourth Circuit requires evidence that "similarly situated" individuals of another race were treated differently than Plaintiffs. *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *United States v. Mason*, 774 F.3d 824, 830, 834 (4th Cir. 2014); *Orgain v. City of Salisbury, Md.*, 305 F. App'x 90, 99–100 (4th Cir. 2008); *see United States v. Armstrong*, 517 U.S. 456, 465 (1996); *United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012); *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997). In turn, "similarly situated" in the selective enforcement context means that the comparators' circumstances have "no distinguishable legitimate enforcement factors that might justify making different

---

[2] *Washington v. Davis*, 426 U.S. 229, 242, 96 S. Ct. 2040, 2048, 48 L. Ed. 2d 597 (1976) (considering totality of the circumstances); *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (identifying four nonexclusive factors); *United States v. Mason*, 774 F.3d 824, 835 (4th Cir. 2014); *Townes v. Jarvis*, 577 F.3d 543, 552 (4th Cir. 2009); *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995).

enforcement decisions with respect to them." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016); *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012) (applying same formulation for selective prosecution claim); *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (same); *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (same).

Given these authorities, there are a variety of concerns about relevance (Rule 401), jury confusion and unfair prejudice (Rule 403), and lack of expert support for the statistics when used to prove discriminatory effect.

First, the Court doubts the statistics are relevant to the discriminatory effect element because they contain nothing about individuals "similarly situated" to Plaintiffs. The theory in this case is selective enforcement based on obtaining and executing a search warrant. Yet all we know from the stats is that Holmes *cites and arrests* more blacks than his fellow officers and proportionally more than the population of his county and assigned area. Additionally, the statistics do not break down citations and arrests by particular kind of crime, nor do they account for potential racial disparities that might result from crime-based assignments, such as if Holmes or his fellow officers were directed to focus on one type of crime or another. *United States v. Armstrong*, 517 U.S. 456, 469–70 (1996) (finding "presumption that all people of all races commit all kinds of crime" proportionally was "at war" with statistics from U.S. Sentencing Commission; concluding that studying which "failed to identify individuals who were not black and could have been prosecuted for the offense for which respondents were charged, but were no so prosecuted" was not even "some evidence" of discriminatory effect).

Without these types of information, the raw statistics simply don't advance the ball because they leave the jury without any indication of whether "distinguishable legitimate enforcement factors" differentiate Plaintiffs from some (as yet unidentified) non-black citizen

who (by hypothesis) received different treatment. *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016); *Foster v. Tandy Corp.*, 848 F.2d 184, at *5 (4th Cir. 1987) ("[R]aw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value."). In an analogous case, the Supreme Court summarily reversed on the discriminatory effect element when a lower court relied on "statistics demonstrating that the United States charges blacks with a death-eligible offense more than twice as often as it charges whites and that the United States enters into plea bargains more frequently with whites than it does with blacks." *United States v. Bass*, 536 U.S. 862, 863 (2002). The Supreme Court bluntly stated that "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." *Id.* at 864. So if raw statistics regarding overall arrests and citations say nothing about Holmes' arrests and citations against similarly situated non-black citizens, it is even more difficult to understand what Holmes' arrest and citation statistics could possibly tell the jury about his *search warrant* practices.

Second, in the context of racial discrimination cases, courts frequently find raw statistical evidence inappropriate to place before a jury without guidance from the proponent's expert. "[I]f a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." *Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994); *e.g.*, *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261–63 (4th Cir. 2005) (affirming exclusion of expert testimony based on statistics that failed to compare similarly situated workers, categorizing them by "group" rather than single job title); *Luh v. J.M. Huber Corp.*, 211 F. App'x 143, 149 (4th Cir. 2006) (affirming summary judgment where plaintiff had introduced raw statistics breaking down a reduction-in-force by race, because "[t]here was no expert testimony as to methodology justifying the sought

conclusion of discrimination or relevance of the statistics to the plaintiff's claim."). To take one example, the Fourth Circuit affirmed exclusion under Fed. R. Evid. 403 of evidence showing "the percentage of qualified blacks in the greater Washington area relative to the percentage employed by" defendant, when the plaintiff sought to introduce "this evidence without expert testimony as to how the statistics were compiled or how they related to [the] claim." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 n.1 (4th Cir. 1989). These authorities support exclusion.

Finally, the Fourth Circuit's *Hare* decision strongly supports the conclusion that statistics Plaintiffs seek to introduce simply cannot be used to show discriminatory effect.

> Appellants' statistical evidence, indicating that all 32 defendants prosecuted in stash house sting cases in the District of Maryland have been black, does not meet [the standard requiring discriminatory effect and discriminatory purpose]. We have explained that "absent an appropriate basis for comparison, statistical evidence [of racial disparity] alone cannot establish any element of a discrimination claim." *Olvis,* 97 F.3d at 745. In *Olvis,* the defendants presented evidence showing that in the Norfolk–Newport News area of Virginia, "more than 90% of those indicted . . . since 1992 for crack cocaine trafficking are black." 97 F.3d at 741, 745. We found this insufficient to demonstrate a discriminatory effect, as the data provided "no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." *Id.* at 745. "Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants prove[d] nothing." *Id.* Similarly, in *Venable,* we found that statistics showing that blacks made up approximately 87% of those charged with certain firearm offenses in the Eastern District of Virginia did not constitute evidence of discriminatory intent, as the data provided "no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes." 666 F.3d at 903.
>
> Appellants' statistical evidence similarly provides no appropriate basis for comparison, as it contains no data on similarly situated white individuals who could have been targeted for stash house sting investigations but were not.

*United States v. Hare*, 820 F.3d 93, 99–100 (4th Cir. 2016).

Although Plaintiffs' opposition brief cited three cases to support admission, none provide much benefit to their cause.

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) provides minimal guidance beyond the bare statement that statistical proof can be used. *Id.* at 534. It contains a single mention that the lower court "noted that over ninety percent" of state police immigration inquiries in Ohio concerned Hispanics. *Id.* at 535. The point was a passing one, with no explication of the source of the data, how the underlying information was compiled, whether (and if so how) an expert analyzed it, or—based on any of that—whether it should be admitted. *Id.* Indeed, because the case was on interlocutory appeal regarding qualified immunity, the Sixth Circuit explicitly did not delve into questions of admissibility or "evidentiary sufficiency" of the record. *Id.* at 536–37.

The Seventh Circuit case relied on by Plaintiffs cuts against them. That case held that it is not enough to simply compare police interdictions between racial groups on the whole, but rather between "similarly situated" individuals within each racial group (in that case, motorists suspected of drug activities). *Chavez v. Ill. State Police*, 251 F.3d 612, 639, 641 (7th Cir. 2001). This undercuts the relevance and reliability of Plaintiffs' statistics, as explained above. *Chavez* also found that the statistics—which were explained far more than those here—were, despite being the product of expert testimony, "insufficient as a matter of law" because they were neither relevant nor reliable. *Id.* at 641. The Seventh Circuit also rejected using regional demographic information like the type in this case to determine the racial makeup of similarly situated motorists. *Id.* at 642–45.

Finally, in *United States v. Alabi*, the criminal defendant compiled a list of 23 roadside searches over six months, 21 of which involved non-white drivers. Yet that statistical evidence was "of little use" because it failed to explain, *e.g.*, the demographic characteristics of all individuals driving in the area during the relevant time frame and "failed to demonstrate drivers

of different races speed with the same frequency." *United States v. Alabi*, 597 F. App'x 991, 997 (10th Cir. 2015); *see id.* (citing authority requiring reliable demographic information, a method for assessing whether the data covers similar individuals, and information about actual crime rates across relevant races).

In sum, Plaintiffs' statistical evidence has little if any relevance to the discriminatory effect elemnt because it lacks any information about Holmes' actions against similarly situated individuals of a different race. Even if the statistics had some relevance, the absence of an expert to provide a meaningful explanation of them, their apples-to-oranges comparison of citations/arrests to search warrant, and their failure to account for possible disparities in officer assignments create an extremely high risk that the jury would be confused or mislead by them, or that Holmes would suffer unfair prejudice from their admission. The balance thus tips to their exclusion.

### B. Testimony of other incidents

Officer Holmes moves to exclude the testimony of witnesses Rodney and Savannah Hubbard, Cory Grady, Sergio Harris, and Robert Douglas, who did not witness the events at issue in this case. These witnesses, who are black, intend to testify about various discriminatory police practices they contend Holmes took against them.

Ultimately, the issue is whether this evidence should be admitted as "bad acts" under Rule 404(b), which itself includes a Rule 403 analysis. While the rule does not permit such evidence to prove character, it does permit using other bad acts to show, *e.g.*, intent or motive. Rule 404 is one of inclusion (*i.e.*, acts going to something other than character should be admitted), and—contrary to Holmes' assertion at oral argument—it "covers evidence of both prior and subsequent acts." *United States v. Mohr*, 318 F.3d 613, 617 (4th Cir. 2003).

A court weighs the admissibility of Rule 404(b) evidence in a four-part test. The evidence must be (1) relevant to an issue, such as an element of the offense; (2) necessary in the sense that it is probative of an essential claim or an element of the offense; (3) reliable; and (4) admissible under Federal Rule of Evidence 403, in that its prejudicial nature does not substantially outweigh its probative value. Rule 403 requires exclusion of evidence "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.

*Mohr*, 318 F.3d at 617–18 (internal citations and quotation omitted).

"The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act." *United States v. Hall*, 858 F.3d 254, 260 (4th Cir. 2017). On the third consideration, reliability, "evidence is reliable unless it could not be believed by a rational and properly instructed juror." *United States v. Cowden*, 882 F.3d 464, 473 (4th Cir. 2018).

Fourth Circuit authority favors the admission of other acts of discrimination to prove a defendant's discriminatory intent in the present case. *See*, *e.g.*, *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992) (*en banc*) (holding introduction of business's non-compliance with a decade-old consent decree, in order to show racial motive and intent, did not violate Rule 403 or 404(b)); *King v. McMillan*, 594 F.3d 301, 310–11 (4th Cir. 2010) (affirming admission in Title VII case of testimony from other individuals of protected class who were subjected by defendant to harassment); *see also Buckley v. Mukasey*, 538 F.3d 306, 318–20 & n.15 (4th Cir. 2008) (reversing district court's limitation under Rules 402, 403, and 404 of evidence about years-old consent decree against defendant for racial discrimination, although the purpose of such evidence was to show *retaliatory* rather than racial animus due to plaintiff's participation in the prior litigation; citing with approval *Hugo's Skateway*).

More granularly, the first and second prongs of 404(b) are met for reasons largely stated above—to assess Holmes' discriminatory intent, the jury can consider a pattern of race-based actions or a "historical background" of discrimination. *See supra* footnote 2. The evidence is also reliable because a juror could believe the witnesses' account of discrimination at the hands of Holmes. *Cowden*, 882 F.3d at 473. And although there are some differences between the circumstances, they are not far apart in time (especially compared to the multiyear gaps in some cited above) and generally map onto Plaintiffs' theory about Holmes—that he uses police investigative techniques to harass black citizens (especially ones with nice cars) based on the pernicious assumption that they are likely involved in criminal drug activity.

The real action is the fourth prong under Rule 404(b), which is conducting a Rule 403 analysis. For exclusion under that rule, the risk of unfair prejudice, jury confusion, or waste of time must substantially outweigh the probative value of the evidence. "[T]he trial court must assess the proponent's need for admission of the evidence in the full evidentiary context of the case." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 720 (4th Cir. 2014).

As explained above, the evidence is strongly probative of Officer Holmes' intent and state of mind, and critical to an element of Plaintiffs' case. While there might be some prejudice to Holmes from the testimony, that prejudice can be reduced by a limiting instruction that the evidence is meant only to show intent—the Fourth Circuit generally favors giving a limiting instruction when a district court permits "bad act" evidence. *E.g.*, *Cowden*, 882 F.3d at 472, 473; *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992). Moreover, it's not clear that it would be "unfair" prejudice for witnesses to discuss other allegedly racially discriminatory instances when the very issue is whether Holmes acted with discriminatory intent. And while

Holmes fears that the testimony will devolve into a series of mini-trials, this concern can be managed by the Court and through conscientiousness from Plaintiffs' counsel. *Purdee v. Pilot Travel Centers, LLC*, No. CV407-028, 2010 WL 11537542, at *2 (S.D. Ga. Jan. 11, 2010) (permitting "me too" evidence with suggestion that plaintiff focus on her best examples).

### C. The stop and citation of Canada

Finally, Officer Holmes points out that the Court already found the traffic stop and citation did not violate the Fourth Amendment. He therefore argues that testimony about it is should be excluded, except to establish background. Specifically, he urges that no testimony (or argument of counsel) be permitted that suggests the stop was evidence of discrimination.

In their response brief, Plaintiffs did not present any argument against this aspect of Holmes' motion. Accordingly, this part of the motion will be granted.

\*     \*     \*

Defendant Holmes' motion *in limine* is **GRANTED in part** and **DENIED in part**. The statistics may be admitted for the purpose of showing discriminatory intent but not discriminatory effect. Plaintiffs' witnesses may testify about other law enforcement actions of alleged racial discrimination taken against them by Holmes. The parties should limit their evidence and argument about the stop of Canada's car to necessary background that is relevant to this case.

It is so **ORDERED**.

Entered this  19th  day of March, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE